UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In Re:

SHAO KE,                                                           Chapter 7
                                                                   Case No.: 09-32272
                                        Debtor.
_____

JIANRONG WANG,                                                     Adv. Pro. No.: 09-50132

                                        Plaintiff,

        v.

SHAO KE,

                                        Defendant.
_____

APPEARANCES:

THE CROSSMORE LAW OFFICE                               Edward Y. Crossmore, Esq.
*Attorneys for Plaintiff*
115 West Green Street
Ithaca, New York 14850

EDWARD E. KOPKO, P.C.                                  Edward E. Kopko, Esq.
*Attorney for Debtor-Defendant*
308 N. Tioga Street, 2nd Floor
Ithaca, New York 14850

Honorable Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

        The matter before the Court is the Adversary Complaint filed by the plaintiff, Jianrong

Wang ("Wang"), against the debtor-defendant, Shao Ke ("Debtor"), on November 5, 2009 (ECF

Adv. No. 1),[1] in which he seeks a determination that a judgment debt owed to him by Debtor is

_____

[1] Documents filed in the adversary proceeding shall be referenced as ("ECF Adv. No. __"), whereas documents filed in Debtor's main chapter 7 case shall be referenced as ("ECF No. __").

nondischargeable pursuant to 11 U.S.C. § 523(a)(4).[2]  Debtor filed a voluntary chapter 7 bankruptcy petition and schedules on August 12, 2009 (ECF No. 1), therein listing Wang as a pre-petition creditor holding a $313,090.00 claim subject to discharge.  This filing spawned the instant nondischargeability proceeding, which is the final chapter of years of litigation between the parties.

## JURISDICTION

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 157(a), (b)(1), (b)(2)(I), and 1334(b).

## BACKGROUND

### The Parties' History and State Court Background

The parties' relationship and business dealings are well documented in prior decisions and orders issued by New York State Supreme Court Justice Robert C. Mulvey (Pl.'s Exs. 2–4), the New York State Supreme Court, Appellate Division for the Third Judicial Department ("State Appellate Division") (Def.'s Ex. 1), and United States Bankruptcy Judge Margaret Cangilos-Ruiz (ECF Adv. No. 30).[3]  Collectively, these courts have pieced together the following narrative concerning the parties' past dealings with one another.

In late 2003, Wang and Debtor entered into discussions regarding the formation of a partnership for the acquisition and operation of a Chinese restaurant in Ithaca, New York.  In January 2004, with the assistance of his accountant in New York City, Debtor incorporated the

---

[2] Unless otherwise indicated, citations to statutory section numbers are to sections within the United States Bankruptcy Code (the "Bankruptcy Code"), 11 U.S.C. §§ 101–1532 (2010).

[3] On October 11, 2012, the Honorable Margaret Cangilos-Ruiz issued an order recusing herself from presiding over the instant adversary proceeding.  (ECF Adv. No. 40.)  Accordingly, on October 12, 2013, the Clerk of Court reassigned and transferred the adversary proceeding to the undersigned.  (ECF Adv. No. 42.)

business under the name of "Peace Food Inc." ("Peace Food"),[4] and the parties opened the restaurant for business on May 26, 2004.  In addition to Debtor, the initial shareholders in the corporation were Wang, Wang's former wife, Peiling Xu ("Xu"), George Wang, Debtor's former wife, Runwen Li ("Li"), and Debtor's former brother-in-law, Guoqiang Long ("Long").  In the beginning, Xu was employed as a bookkeeper and cashier, Debtor was employed as a manager, Li was employed as a cashier, and Long and George Wang were employed as chefs.

The parties' relationship quickly deteriorated and, in 2005, Wang successfully petitioned the New York State Supreme Court ("State Trial Court") for the judicial dissolution of Peace Food.  In a separate action, Wang subsequently sued Debtor alleging four separate causes of action: (1) theft or defalcation of corporate monies by Debtor pursuant to New York Business Corporation Law § 717(a); (2) to compel an accounting by Debtor due to the transfer of corporate monies pursuant to New York Business Corporation Law § 720; (3) for the removal of Debtor as director and officer of Peace Foods; and (4) for the cancellation of stock certificates issued to Long and Li.  (Pl.'s Ex. 2.)  The actions were consolidated (collectively, "State Court Action") and following a nonjury trial, the State Trial Court found significant unexplained discrepancies, among other accounting irregularities, between the daily sales records and the accounting reports prepared and issued by Debtor as well as between the accounting reports presented during trial and the representations Debtor made to prospective purchasers of the restaurant who testified at trial.  (*Id.* at 8–9.)  Based on the evidence presented, the State Trial Court directed that Peace Food be dissolved and that Debtor account for all corporate revenues and expenses for the two-year period when Debtor managed the restaurant.  The State Trial

---

[4] According to the New York State Department of State's business records database, available at http://www.dos.ny.gov/corps/bus_entity_search.html, there is no comma between "Food" and "Inc." in the corporation's actual name.

Court also determined that following transfers of shares in the corporation from George Wang, Li, and Long to Debtor, only Wang and Debtor remained shareholders of Peace Food.

As directed by the State Trial Court, Debtor submitted an accounting.  Wang objected to the accounting on various grounds and moved for partial summary judgment.  Debtor opposed the motion and cross-moved for summary judgment on the issue of liability.  The State Trial Court denied Debtor's cross-motion and found that Debtor was in charge of the day-to-day operations of the restaurant and solely responsible for the handling of all corporate revenues and disbursements from May 26, 2004 to March 2, 2006, and that he failed to account for corporate revenue for the subject period.  (Pl.'s Ex. 3 at 8.)  In support of its findings, the State Trial Court stated specifically that Debtor offered no information to support reported cash pay-outs as legitimate and proper corporate expenses, his testimony regarding 2004 gross sales receipts differed significantly from the 2004 gross sales figure reported on the corporation's annual tax return, and his accounting of total sales contradicted the checking account records and the tax payments prepared by the accountant.  (*Id.* at 5–6)  Moreover, the State Trial Court found that Debtor had improperly used $11,411.37 in corporate funds to pay for legal services rendered to him personally.  (*Id.* at 8.)  Accordingly, the State Trial Court held that Debtor had breached his fiduciary duty to Peace Food and that he had wasted corporate assets.  The State Trial Court also concluded that Wang was entitled to reasonable attorneys' fees, but Justice Mulvey reserved decision on the amount of damages and attorneys' fees pending a damages hearing.  (*Id.*)

Following a two-day damages hearing, by Decision and Order issued on May 8, 2009 (Pl.'s Ex. 4), the State Trial Court reaffirmed its prior findings that the restaurant was in large part a cash operation and Debtor handled all of the cash on a daily basis and that Debtor was responsible for all restaurant revenue.  (*Id.* at 2–3.)  The State Trial Court relied upon Debtor's

testimony that he had managed Peace Food during the time in question, he made all sales tax reports, wrote most corporate checks, executed all corporate income tax returns, and took cash receipts home at the end of every business day. (*Id.* at 2.) The State Trial Court held Debtor liable and surcharged him the following amounts: $11,411.37 for attorneys' fees paid by the corporation to Debtor's personal attorney; $234,581.46 plus interest for failure to account for corporate profits; and $70,000.00 for reasonable attorneys' fees incurred by Wang in connection with the state court actions. Upon further examination, the State Trial Court also held that the stock certificates issued to Debtor and Li were not supported by consideration, thus it cancelled the same. (*Id.* at 5–6.) This left only Wang and Xu as bona fide shareholders of Peace Food.

Debtor appealed the State Trial Court's final decision and challenged, among other findings, the State Trial Court's method of calculating the loss in unaccounted-for funds. The State Trial Court calculated the surcharge by multiplying the restaurant's net profit, which it calculated as the differential in Debtor's reported sales and the accounted for funds, by a 30% standard profit margin. Debtor also questioned the State Trial Court's determination regarding corporate ownership. As a basis for his appeal, Debtor argued the State Trial Court erroneously relied upon certain exhibits and expert testimony that were improperly admitted into evidence.

While the appeal was pending, Debtor filed for relief under chapter 7 of the Bankruptcy Code. Following Wang's commencement of the instant adversary proceeding, Debtor and Michael J. Balanoff, Esq., Chapter 7 Trustee, stipulated to the modification of the automatic stay imposed by § 362(a) to permit Debtor to prosecute the appeal, which was so ordered by Judge Cangilos-Ruiz on April 7, 2010. (ECF No. 8.)

On October 21, 2010, the State Appellate Court issued its decision modifying the State Trial Court's ruling by reducing the surcharge for failure to account for corporate profits from

$234,581.46 with interest to $177,186.72 with interest and crediting Debtor with 50 corporate shares, which then amounted to a one-half interest in the corporation. (Def.'s Ex. 1.) The State Trial Court's finding of liability and adjudication of other damages remained intact.

**Background Related to Debtor's Bankruptcy Case**

Following the State Appellate Court's decision, Wang filed for summary judgment in the instant adversary proceeding. (ECF Adv. No. 18.) Wang argued that issue preclusion or collateral estoppel as applied to the State Trial Court's findings of fact and conclusions of law established that his claim was nondischargeable under § 523(a)(4). Judge Cangilos-Ruiz agreed with Wang that the following were conclusively established in the State Court Action and, thus, the bankruptcy court was bound by the same: first, Debtor was clearly a fiduciary for purposes of establishing Wang's claim under § 523(a)(4); second, Defendant misappropriated and failed to account for funds for purposes of § 523(a)(4). (ECF Adv. No. 30.) Because these findings mirror those required for a determination of nondischargeability under § 523(a)(4), Judge Cangilos-Ruiz found them to be decisive in the adversary proceeding as well. Her Honor disagreed, however, with Wang's assertion that issue preclusion operated to also satisfy and bar relitigation of the critical and final § 523(a)(4) element of scienter. Judge Cangilos-Ruiz based her ruling in this respect on three factors: first, Debtor denied knowledge of his fiduciary duty; second, the State Trial Court made no direct finding of Debtor's conscious misbehavior or extreme recklessness, which is required for purposes of § 523(a)(4) as discussed *infra*; and third, the bankruptcy court could not infer Debtor's state of mind so as to satisfy the scienter requirement. As such, Judge Cangilos-Ruiz granted partial summary judgment in favor of Wang and directed trial on the limited issue as to whether Debtor had the requisite scienter to support a § 523(a)(4) claim.

This Court began a trial on the narrow issue of intent on October 26, 2012, during which it heard complete testimony from Wang (Trial Tr. vol. 1, Oct. 26, 2012, ECF Adv. No. 74) and direct testimony from Debtor (Trial Tr. vol. 2, Oct. 26, 2012, ECF Adv. No. 56). The trial resumed and concluded with the completion of Wang's testimony on November 19, 2012. (Trial Tr. vol. 3, Nov. 19, 2012, ECF Adv. No. 72.) The parties were then afforded an opportunity to file post-trial memoranda of law. Wang filed his memorandum on January 4, 2013 ("Wang's Memorandum," ECF Adv. No. 78). Debtor filed his memorandum the same date ("Debtor's Memorandum," ECF Adv. No. 79). The matter was then taken under advisement. The Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 based upon the record created in this adversary proceeding.

## FACTS

Given the customary method of proving intent through cumulative and circumstantial evidence, counsels' respective questioning of both witnesses necessarily focused in large part on facts already decided by the three preceding courts to have addressed the parties' longstanding dispute. As such, this Court recites only on those previously and newly established facts most relevant to its determination of whether Debtor possessed the requisite culpable mental state when he committed defalcation to except the judgment debt at issue from Debtor's discharge. With this objective in mind, the testimony and documents admitted into evidence reveal the following:

1.    Wang was born in China and his native language is Mandarin. (Trial Tr. vol. 1, 6.) Wang came to the United States in January 1999, after accepting an offer as a visiting scholar at Cornell University ("Cornell"). He has his Green Card and has applied for United States citizenship. He is currently an adjunct professor in China and he spends time in both the

United States and China.  He has a Ph.D. from the Chinese Academy of Sciences and an MBA that he obtained online through a United States educational institution.  (*Id.* at 5–6.)  He testified that he works for Cornell part-time conducting research in stem cell biology.  (*Id.* at 6.)

2.      In 2003, Wang decided to open a Chinese restaurant in Ithaca, New York ("Ithaca").  He testified that his grandfather and father work in the restaurant business in China and that he wanted to introduce Americans to a healthier Chinese food.  At the time, he was married to Xu and she had previously worked as a cashier in a Chinese restaurant formerly owned and operated by Debtor.  (*Id.* at 7; Trial Tr. vol. 2, 4)

3.      Debtor was born in China and came to the United States in 1988.  (Trial Tr. vol. 3, 3.)  He received a high school education in China and he testified on direct examination that he has never taken any coursework or had any formal training with respect to the hospitality industry.  (Trial Tr. vol. 2, 4.)  Debtor testified on cross-examination that he did attend college in China where he took language courses but that he did not earn a graduate degree.  (*Id.* at 4.)  He further testified that he never studied in the United States and that he never studied economics or management.  (*Id.* at 6.)

4.      Debtor's work experience is varied.  While in China, Debtor worked on a rice farm and in a plastics factory.  While at the factory, Debtor was promoted to supervisor, then manager in charge of the sales department, and finally, general manager.  (*Id.* at 7–9.)  As a manager, Debtor made and kept written records of the company's sales figures.  (*Id.* at 10.)

5.      Debtor followed his older brother to the United States and first resided in State College, Pennsylvania, where he took a three-month language course at Pennsylvania State University. (*Id.* at 11.)  His first job in the United States was as a delivery person for a Chinese restaurant in New York City.  His next job was as a taxi driver in New York City.  (*Id.* at 11.)

Debtor testified that in both positions, he kept a written record of cash receipts and he reported them to the companies he worked for.  (*Id.* at 12–14.)  As a taxicab driver, he also kept a somewhat regular written record of expenses.  (*Id.* at 14.)

6.    After five years as a taxicab driver, Debtor moved to Elmira, New York, where he purchased and operated an Asian grocery store.  (*Id.* at 15.)  Debtor testified that his accountant helped him register the grocery store as a corporation, but he knew very little about corporate forms and he relied solely on his accountant to set up the business.  (*Id.* at 16–17.)  After a short period of time, Debtor moved the grocery store to Ithaca.  (*Id.* at 18.)  Debtor testified that he kept written records of the grocery store's cash and credit receipts, expenses, and bank account deposits.  (*Id.* at 20.)

7.    After approximately two years, Debtor opened a Chinese restaurant in Ithaca under the name of Hong Kong Restaurant ("Hong Kong"), which he owned from 1998 to 2000. (*Id.* at 21.)  Debtor testified that he kept written records of Hong Kong's cash and credit receipts, expenses, and bank account deposits.  (*Id.* at 22.)  During the same time period, Debtor also managed Chang An Gourmet Restaurant ("Change Gourmet"), which was located in Ithaca and owned by Li.  (*Id.* at 23.)  As manager of Chang Gourmet, Debtor kept similar written records regarding receipts, expenses, and deposits for the business.  (*Id.* at 27.)  In October 1998, there was a fire at Chang Gourmet that ultimately led to a lawsuit.[5]

---

[5] Debtor was deposed in connection with the Chang Gourmet litigation commenced in Tompkins County, New York.  During his cross-examination of Debtor in this proceeding, Attorney Crossmore introduced a certified copy of the transcript of Debtor's deposition testimony taken in that action.  (Pl.'s Ex. 60.)  Debtor therein testified that he had studied economic management for two years at a college in China.  (*Id.* at 5.)    Attorney Kopko objected to the admission of this evidence based upon Wang's failure to produce the same by the discovery deadline set by Judge Cangilos-Ruiz in the June 12, 2012 scheduling order setting this proceeding for trial (ECF Adv. No. 34), as amended by the undersigned's October 15, 2012 Amended Scheduling Order (ECF No. 45), and the Court reserved decision.  Given the numerous other bases upon with the Court makes its credibility determination with respect to Debtor as described below, the Court need not decide this evidentiary issue.  In order to complete the record, however, the Court overrules Debtor's objection under Federal Rule of Civil Procedure ("Rule") 26(a)(1), made

8.        After Debtor sold Hong Kong, he relocated to Florida and invested in a Howard Johnson Hotel.  (*Id.* at 31.)  In connection with the hotel investment, Debtor incorporated as the sole shareholder American Asian Investment, Inc. ("AAII"), which he then ran as president.  (*Id.* at 32.)  Debtor could not recall the exact amount he invested in the hotel business, but he testified that it was more than $100,000.00.  Debtor lost the investment and AAII became involved in a lawsuit with the hotel owner, An Hwa Chen ("Chen").   The trial occurred in Polk County, Florida in November 2003.   As part of the record in this proceeding, over the objection of Debtor's counsel, the Court admitted into evidence a December 3, 2003 letter bearing Debtor's signature addressed to Judge Judith J. Flanders, in which Debtor stated that he was defrauded of $360,000.00 during a seven month period.  (Pl.'s Ex. 36.)  Debtor therein indicated that he had invested this money as a down payment pursuant to an offer and contract to purchase the hotel property from Chen and another individual, but that he had been defrauded and the Howard Johnson franchise had been cancelled, causing him to become bankrupt and divorced.  (*Id.*)  On cross-examination, Debtor testified that he never wrote that letter.  (Trial Tr. vol. 3, 37, 44.) When asked about the contents of the letter during the State Court Action, however, Debtor testified that he could not remember whether he told Judge Flanders that he became bankrupt and divorced.  (Pl.'s Ex. 7 at 45.)

9.        In May 2001, Debtor left Florida and returned to Ithaca.  He became the manager of Capital Corner Restaurant ("Capital Corner"), a Chinese restaurant owned by Li.  (Trial Tr. vol. 3, 46.)  Debtor initially testified that Li owned Capital Corner.  When asked whether he ever owned it, he answered, "I forgot."   (*Id.*)   During the same line of questioning on cross-examination, Debtor admitted that he was the sole shareholder and president of Capital Corner

---

applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7026, for the reason that Rule 26(a)(1) specifically excludes impeachment evidence from pretrial disclosure requirements.  FED. R. CIV. P. 26(a)(1).

Restaurant, Inc., the corporation that owned Capital Corner.  (*Id.* at 47; Pl.'s Ex. 62.)  As he did for all prior corporations whose restaurants he managed, Debtor kept a written record of Capital Corner's cash receipts and expenses.  (Trial Tr. vol. 3, 49.)  Debtor eventually sold Capital Corner and worked briefly as a taxicab driver in Ithaca before becoming involved with Peace Food.  (*Id.*)

10.    Debtor testified that he advised and partnered with Wang and Xu when they told him they planned to open a new restaurant.  (*Id.* at 5.)  Debtor further testified that once the restaurant opened for business, Wang did not work in the restaurant because he was working at Cornell, but Xu was employed there as a full-time cashier and bookkeeper and Debtor was employed as the restaurant's manager.  (*Id.* at 7–8.)

11.    According to Wang, in late 2003, Debtor approached him seeking a management position when he learned that Wang planned to open a Chinese restaurant in the city.  (Trial Tr. vol. 2, 8.)  Debtor told Wang that he had a lot of experience running businesses, including a Chinese restaurant, grocery store, and a hotel.  Specifically, Debtor told Wang that he formerly co-owned and operated two Chinese restaurants.  (Trial Tr. vol. 1, 8.)  Wang testified that the parties agreed that Debtor could become a co-owner of the restaurant if he could borrow money from relatives and friends to provide the necessary investment in the business.  (*Id.* at 17.)

12.    Wang testified that the shareholders of Peace Food held a corporate meeting at his home in January 2004, which resulted in the execution of a corporate resolution dated and signed by all the shareholders, including Debtor, on January 16, 2004 (the "January Resolution").  (Pl.'s Ex. 10.)  The January Resolution included, *inter alia*:

> 1.3    Jianrong Wang was elected director and manager.  He will be in charge of restaurant daily affairs and preparing for tax return.  During the construction of the restaurant, he will be in charge of collecting and managing investment money from the shareholders, purchasing equipment

> for the restaurant including Chinese bakery, BBQ and fast food equipment.
>
> . . . .
>
> 2.8    Important issues including hiring should only be decided by the board. However, all shareholders have equal rights to direct review original and processed business records in person.
>
> 2.9    Every sale should be recorded in the register.  Original sales records should be daily signed by at least two shareholders who are not related.
>
> 2.10   A safe will be purchased by the corporation for keeping overnight cash, checks and important documents.
>
> 2.11   No one is allowed to take the corporation's money or any property home at any excuse.
>
> . . . .
>
> 2.13   Reimbursement in the corporation can't be approved without formal invoices.  Reimbursement for more than $500 should only be approved with signatures by at least two shareholders who are not related, and the specific and detailed purpose for the spending must be provided in writing.
>
> 2.14   When a shareholder needs to write a corporation check of more than $1,000 for business purpose, he needs approval in advance by at least two shareholders who are not related.
>
> 2.15   No one is allowed to spend corporation's money for his/her own purpose.
>
> 2.16   If shareholder's wrongdoing or unauthorized action causes the corporation a significant loss, he should be fully responsible for that loss economically and legally.
>
> 2.17   When shareholder is found stealing or defalcating corporation money, causing significant loss to the corporation, and refuses to return the money immediately to the corporation after being warned, his/her ownership should be terminated.  He can get his/her investment money back, subtracted by the number of the money stolen or corrupted.

(Pl.'s Ex. 10.)[6]

13.    Debtor claimed in the State Court Action and again testified before this Court that he never signed the January 2004 Resolution and that it was a forgery.  (Trial Tr. vol. 1, 11; Trial Tr. vol. 3, 57.)  In fact, in this proceeding he testified that the shareholders meeting Wang spoke of never actually happened.  (Trial Tr. vol. 1, 11.)

14.    Wang testified that the shareholders of Peace Food held a second shareholder meeting at his home in February 2004, which resulted in the execution of a corporate resolution

---

[6] Quotations to the parties' corporate documents are unedited.

that was dated and signed by all the shareholders, including Debtor, on February 16, 2004 (the

"February Resolution").  (Pl.'s Ex. 11.)   The February Resolution included, *inter alia*:

5.    Proposed by Shao Ke, the board approved Jianrong Wang, the president, will not be in charge of management of the corporation after the restaurant starts operation since he works out of the corporation in weekdays; Shao Ke, the manager, will be in charge of management including hiring, tax return report, bookkeeping including spending records in restaurant construction and contacting the CPAs in New York City; Peiling Xu will resume Shao Ke's duty when he takes day off or out of the town; George Wang, the secretary, together with [Debtor], the manager, will be in charge of keeping corporate documents, records, checks and overnight cash (all put into bank account next morning) in the fire safe in business space.

6.    Shareholder's investment fund should be deposited into the corporation bank account or collected by the manager a day before the restaurant construction is ended.  Contribution by shareholder later than that deadline will not be accepted as investment but no[n] refundable donation to the corporation.

. . . .

11.    Shareholder should be fully responsible for the corporation economical loss caused by his or her wrongdoings and such loss will be judged based on monthly normal sales and profit average as a standard.  Shareholder should fully be responsible for other shareholders' economical loss or expense caused by his or her wrongdoings or violations of corporation resolutions.

12.    Dividend should be released to shareholders proportional to his/her investment at end of every business year after full shareholders' meeting or full board meeting reviews accounting record and approves the dividend payment scheme.

(Pl.'s Ex. 11.)

15.    In the State Court Action, Debtor admitted that the incorporators of Peace Food

held several meetings in the months following incorporation, but argued that the January 2004

and February 2004 Resolutions and a shareholders' agreement bearing his purported signatures

were forgeries.  Wang produced expert testimony in document analysis that Debtor's signatures

were authentic photocopies and that there was no basis to conclude that his signature had been

improperly placed on the photocopied documents.  (Pl.'s Ex. 2 at 3.)  The State Trial Court found

that these documents were authentic copies, but it did not rely upon the same in its decision because no foundation was established to confirm that the copies were made as part of the regular course of the business of the corporation.  (*Id.* at 6.)

16.    With respect to the January and February Resolutions, Wang testified that he prepared the original draft documents on each of the meeting dates, he then offered the respective drafts to each of the shareholders for their review, and the parties signed the documents while he was present.  Wang further testified that he witnessed Debtor execute both documents. [7]  (Trial Tr. vol. 1, 20–21, 29.)

17.    After Peace Food opened in late May 2004, a dispute arose between the shareholders concerning Debtor's hiring of his brother-in-law, Long, who was residing illegally in the United States.  Disputes also arose between Wang and Debtor because Debtor refused to provide Wang with evidence of his investment as a shareholder in the business and failed to provide sales and expense records for the business.  (*Id.* at 34–35.)

18.    Wang testified that he eventually became aware of two Peace Food checks totaling $5,000.00 that were signed by Debtor and made payable to cash.  (*Id.* at 35–36; Pl.'s Exs. 13–14.)

19.    Because the cashing of these checks violated the January 2004 Resolution, a corporate meeting was called and held on September 26, 2004.  (*Id.* at 38–39; Pl.'s Ex. 15.)  The minutes of that meeting provided, *inter alia*:

1.    The meeting confirmed that unknown spending around $5,000 by [Debtor] was found.  The money in the account was found cashed to [Debtor].
2.    [Debtor] admitted that conduct and promised to be financially responsible for the money no later than the end of this year 2004.  He asked if the

---

[7] At trial, Debtor did not object to the admission of these exhibits on hearsay grounds, presumably because Wang's testimony established the proper foundation pursuant to Federal Rule of Evidence 803(6).  Debtor did, however, object to their admission on relevancy grounds under Federal Rule of Evidence 401, which the Court overruled in each instance.

> corporation forgave him this time and did not disclose this matter to others, he could resign from the position of the restaurant manager and yield the signer right to other shareholders.
>
> . . . .
>
> 6.    [Debtor's] hiring illegal immigrants including Guoqiang Long, his improper tax report and forcing other shareholder hand copy business data he prepared, was criticized by the meeting and demanded correction. [Debtor] insisted that his doing in these issues was in the interests of [sic] all shareholders and promised to be responsible for the risks.

(Pl.'s Ex. 15.)

20.    After this meeting, Debtor convened two shareholder meetings at his attorney's office, during which he sought to remove and replace Wang as president of Peace Food.  (Trial Tr. vol. 1, 43–47; Pl.'s Exs. 16–17.)  The minutes from that meeting reported that the motion was unanimously approved.  (Pl.'s Ex. 13.)  Wang testified that his agreement to step down as president was made under duress following the other shareholders' threat that if he refused to step into the position of secretary, his involvement with Peace Food would be terminated altogether.  (Trial Tr. vol. 1, 47.)

21.    On January 31, 2005, Debtor issued a special meeting notice for February 11, 2005, seeking to remove Wang as a director of Peace Food and to engage Wiggins and Masson, LLP as counsel to defend Debtor in the State Court Action.  (Pl.'s Ex. 18.)  This meeting never occurred, however, because Justice Mulvey disallowed it.  (Trial Tr. vol. 1, 53.)

22.    At trial, numerous checks, business records, and related translations from Chinese to English were introduced by Wang and admitted into evidence showing checks signed by Debtor and made payable to cash for reimbursements from Peace Food to Debtor for corporate investments, equipment purchases, and attorneys' fees.  (Pl.'s Exs. 13–14, 15–18, 20–24, 26–30.)  At trial, Debtor disputed that any of these reimbursements were improper, notwithstanding the State Trial Court's findings to the contrary.  Debtor again testified before this Court that he never

stole money from Peace Food, but that he did regularly use cash to pay restaurant supply vendors in order to obtain a cash discount.  (Trial Tr. vol. 2, 23.)

23.    It was common practice for Debtor to take the cash receipts home from Peace Food on a daily basis.  Debtor testified that he would regularly return the cash to the restaurant the following day, where he would give the cash to Xu.  (Trial Tr. vol. 3, 59–60.)

24.    When asked on re-cross examination whether Debtor had any record of how much of Peace Food's cash he regularly kept at home in 2004, Debtor stated that he kept no written record of the same.  (*Id.* at 65.)  He further testified that part-time employees were paid in cash using those funds but that he did not recall the specific amounts of wages paid.  (*Id.* at 66–67.)  As to his own income, when asked by Attorney Crossmore whether he felt entitled to keep a different amount of money every day from the restaurant, Debtor answered that "every day's income was different, so my income was different."  (*Id.* at 86.)

## ARGUMENTS

The parties agree that the Second Circuit set the controlling legal standard under § 523(a)(4) in the case of *Denton v. Hyman (In re Hyman)*, 502 F.3d 61 (2d Cir. 2007), *cert. denied*, 129 S. Ct. 895 (2009), wherein it aligned itself with the First Circuit and held that "defalcation" under this section "requires a showing of conscious misbehavior or extreme recklessness–a showing akin to the showing required for scienter in the securities law context," *id.* at 68 (collecting cases).[8]  Naturally, the parties' agreement ends here.

Wang contends that the extent of Debtor's accounting shortfall, Debtor's repeated failure to act, or attempt to act, in good faith in accordance with the directives of Peace Food and the other shareholders regarding the handling and reporting of cash receipts and expenditures, his

---

[8] As discussed in greater detail below, while this proceeding was under advisement, the United States Supreme Court confirmed that the Second Circuit adopted the correct legal standard under § 523(a)(4) in *Hyman*.  *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754 (2013).

utilization of corporate funds for personal reasons, and his admission of wrongdoing, when viewed in light of his exhibited familiarity with Peace Food's operating procedures and corporate resolutions and his general business acumen, demonstrates that he possessed the requisite level of scienter to except the judgment debt at issue from discharge.   Despite Debtor's testimony to the contrary, Wang argues that Debtor "was no neophyte in corporate matters," and from the facts and circumstances presented, it may fairly be concluded that Debtor engaged in deliberate behavior at worst or extremely reckless behavior at best so as to prevent him from now being able to discharge the judgment debt owed to Wang.   (Pl.'s Mem. at 36.)   To support his assertion of intentional misconduct, Wang points out that Debtor utilized the misappropriated funds for personal benefit and that he repeatedly lied under oath concerning his business acumen in what Wang refers to as the "white heart, empty head" defense.   (*Id.* at 43.)   Further, Wang avers that the necessary measure of scienter can be presumed from Justice Mulvey's preclusive finding that Debtor falsified Peace Food's records and tax returns.   (*Id.* at 39–40.)   Alternatively, to support his assertion of extreme recklessness, Wang specifically asserts that Debtor clearly knew that he was responsible for the safekeeping of Peace Restaurant's cash, yet he admitted during multiple court proceedings that he had no idea how much of the cash he had paid to others or to himself. (*Id.* at 39.)    According to Wang, Debtor has done no more than make "unsubstantiated protestations" that he is innocent of any wrongdoing in his relations with Peace Food and Wang personally.   (*Id.* at 43.)

Debtor's Memorandum first raises the affirmative defense of issue preclusion,[9] arguing therein that Wang should be precluded from relitigating the issue of Debtor's state of mind

---

[9] As explained by Judge Cangilos-Ruiz in Her Honor's prior decision in this case, the United States Supreme Court has adopted the use of the terms "issue preclusion" and "claim preclusion" in discussing the preclusive effect of a judgment under the overarching doctrine of "res judicata."   *Jianwong Wang v. Shao Ke (In re Shao Ke)*, 2012 Bankr. LEXIS 2349, at *11 n.11 (Bankr. N.D.N.Y. May 23, 2012) (citing *Taylor v. Sturgell*, 553 U.S. 880 (2008)).   "'Claim

because both the State Trial Court and the State Appellate Division implicitly ruled on the same. (Debtor's Mem. at 1.)  Debtor asserts that his "alleged defalcation while acting in a fiduciary capacity under § 523(a)(4) of the Bankruptcy Code is identical to the factual and legal circumstances before the [State Trial Court]," where Wang had a full and fair opportunity to litigate those issues.  (*Id.* at 7.)  Debtor contends that the "implication of the [State] Trial Court's silence as to [Debtor's] state of mind is that the [State] Trial Court impliedly determined that [Debtor] did not act willfully or with actual knowledge."  (*Id.* at 8.)  Further, Wang suggests that the State Appellate Division's partial reversal of the State Trial Court and award of a one-half interest in Peace Food to Debtor infers that the State Appellate Division did not believe Debtor was a thief or that his actions were the result of anything other than mere negligence, inadvertence, or similar conduct.  (*Id.* at 9–10.)  Accordingly, Debtor asks this Court to conclude that Wang cannot now seek to relitigate those issues.

As to the evidence presented before this Court, Debtor asserts that Wang failed to carry his burden of proving that Debtor engaged in conscious misbehavior or extreme recklessness while he was acting in a fiduciary capacity.  (*Id.* at 11.)  Debtor takes issue with the fact that the only new evidence produced by Wang in this proceeding was Wang's testimony regarding his understanding of Debtor's actions.  Debtor further challenges Wang's testimony given his admitted lack of knowledge regarding the restaurant business and corporate matters generally.  (*Id.*)

Additionally, Debtor raises other defenses in this proceeding that largely mirror those raised by him in the State Court Action, many of which were rejected outright by Justice Mulvey, including that most, if not all, of the corporate documents bearing his signature are

---

preclusion describes the rules formerly known as 'merger' and 'bar,' while issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'"  *Id.* (quoting *Taylor*, 553 U.S. at 892 n.5 (citing *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 147 (1984))).

forgeries, that Xu stole money from the restaurant and that Debtor therefore was not the sole source of corporate losses (*id.* at 14), that he did not divert corporate funds for personal uses (*id.* at 19), that his actions were in the best interest of Peace Food (*id.* at 20), that he worked diligently at the business investing his time and experience to make Peace Food a viable business (*id.* at 20–21), and that his acts were solely for the benefit of the corporation (*id.* at 22).  Debtor likens himself to the debtor in *Hyman*, stating that he too used corporate funds to pay business debts to ensure the viability of the business, which he asserts was "sound and profitable" when the business was taken over by a receiver in March 2006.  (*Id.* at 20–21.)

## DISCUSSION

While a central purpose of the Bankruptcy Code is to provide debtors with a "fresh start," this completely unencumbered new beginning is reserved for the "honest but unfortunate debtor."  *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234 (1934)).  "The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debt," *id.* at 287, including debts "for fraud or defalcation while acting in a fiduciary capacity," 11 U.S.C. § 523(a)(4).  In order to prevail on a nondischargeability claim, the creditor must prove the same by a preponderance of the evidence.  *Grogan*, 498 U.S. at 291.  Because "[t]he consequences to a debtor whose obligations are not discharged are considerable . . . [and] in many instances, failure to achieve discharge can amount to a financial death sentence," *Hyman*, 502 F.3d at 66, exceptions to discharge must be narrowly construed and genuine doubts must be resolved in favor of the debtor, *id.* (citing *In re Renshaw*, 222 F.3d 82, 86 (2d Cir. 2000); *In re Hayes*, 183 F.3d 162, 167 (2d Cir. 1999)).

The United States Supreme Court recently resolved the longstanding disagreement amongst the various courts of appeals about the mental state that must accompany the bankruptcy-related definition of "defalcation." *Bullock*, 133 S. Ct. at 1758–59 (discussing and comparing circuit views). Referring to this as the "'state of mind' question," the Supreme Court concluded the term requires an intentional wrong, which in turn "includes not only conduct that the fiduciary knows is improper but also conduct of the kind that the criminal law often treats as its equivalent." *Id.* at 1759. Drawing upon the Model Penal Code, the Supreme Court stated that "[w]here actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* (citation omitted). "That risk 'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'" *Id.* at 1760 (citations omitted) (emphasis in original).

Courts within the Second Circuit have been utilizing this heightened standard without difficulty since *Hyman*. In correctly choosing this standard, the Second Circuit explained that it aligned itself with the First Circuit because "[b]y requiring the courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation, the standard we adopt today insures that the harsh sanction of non-dischargeability is reserved for those who exhibit 'some portion of misconduct.'" *Hyman*, 502 F.3d at 68 (quoting *Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 512 (2d Cir. 1937)). The "standard does not reach fiduciaries who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to

be sufficiently culpable." *Id.* at 69.  The Second Circuit previously summarized the specific standard for scienter derived from securities fraud as an "intent to deceive, manipulate, or defraud, or knowing misconduct," which may be proven by showing either "(a) . . . that defendants had both motive and opportunity to commit fraud or (b) strong circumstantial evidence or conscious misbehavior or recklessness." *Grow Up Japan, Inc. v. Yoshida (In re Yoshida)*, 435 B.R. 102, 110 (Bankr. E.D.N.Y. 2010) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (citations and internal quotations omitted)).

The Second Circuit's *Hyman* decision espouses the correct legal standard regarding the scienter requirement under § 523(a)(4), as confirmed by the Supreme Court in *Bullock*.  Further, it is particularly instructive in the present case because it addresses the application of issue preclusion to a state court judgment in the § 523(a)(4) context.  Before the Second Circuit could even reach the question of the correct legal standard, it was required to decide whether issue preclusion precluded further litigation over the dischargeability of the appellant's claim in that case.  The Second Circuit's analysis regarding this issue clarifies why Debtor's repeated assertions that Wang should not have been able to proceed on his dischargeability claim in light of the implicit or explicit findings made by Justice Mulvey in the State Court Action and by the State Appellate Division must fail.  The Second Circuit stated, in pertinent part:

> In finding that Hyman breached his fiduciary duty by 'misappropriating and co-opting assets of the jointly-owned companies for his personal benefit,' the Surrogate's Court made no express findings with regard to Hyman's state of mind.  *We assume that the Surrogate concluded that under New York law such findings were not necessary, since misappropriation and breach of fiduciary duties do not, under New York law, consistently require proof of a culpable mental state.*
>
> Having clarified the standard under § 523(a)(4) and given the unique circumstances of this case, we decline to mechanically apply collateral estoppel. *The Surrogate had neither the ability nor the incentive to apply the standard we announce.*  Moreover, the record contains evidence of Hyman's good faith in using the proceeds of the new Agency to pay off the debtors for which both he

and the Denton estate were liable, and in attempting for years to negotiate a buy-out with the Denton estate–all of which could militate against the required showing of recklessness or conscious misbehavior.    As noted above, *the Surrogate's Court was not required to take such considerations into account when reaching its conclusions concerning misappropriation and breach of fiduciary duty*.  In view of these complexities, we are loath to conclude that an identical issue was necessarily decided or that Hyman had a full and fair opportunity to contest his state of mind. . . .    Accordingly, we conclude that collateral estoppel does not attach.

*Id.* at 69–70 (emphasis added) (footnote omitted) (citations omitted).

The issue of nondischargeability is a matter of federal law governed by the terms of the Bankruptcy Code.  *Grogan*, 498 U.S. at 283 (citing *Brown v. Felsen*, 442 U.S. 127 (1979)).  As was the case in *Hyman*, issue preclusion does not bar Wang from litigating Debtor's state of mind in this proceeding.   As the bankruptcy court ruled in *Hyman*, "defalcation" under § 523(a)(4) is narrower and more restrictive than the legal concepts underlying Wang's state court causes of action.  *Hyman*, 502 F.3d at 65.  Notwithstanding that Debtor unsuccessfully raised this affirmative defense at the summary judgment stage before Judge Cangilos-Ruiz, at which time Judge Cangilos-Ruiz specifically held that the State Trial Court was not required to determine Debtor's state of mind to find that he breached his fiduciary duty imposed by New York Business Corporation Law § 717, *In re Shao Ke*, 2012 Bankr. LEXIS 2349, at *26–27 n.14, Debtor continues post-trial to assert this failed defense.  Although Debtor continues to challenge certain factual and legal determinations made by the State Trial Court and the State Appellate Division, his attempts to do so are futile.[10]  This litigation strategy is entirely baseless and merely

---

[10] The apparent inconsistency in Debtor's positions regarding the preclusive effect of the State Trial Court and State Appellate Division's factual and legal determinations underlying the judgment at issue is not lost upon the Court. On the one hand, Debtor incorrectly asserts that issue preclusion bars Wang from relitigating his § 523(a)(4) cause of action because the State Court Action and this proceeding involve identical elements and burdens of proof and, implicitly, the element of scienter was decided in the State Court Action in Debtor's favor.  On the other hand, Debtor ignores critical state court factual and legal determinations, such as that the corporate documents were authentic and that Debtor was responsible for the so-called gap in the accounting, when those determinations conflict with his version of events and are thus detrimental to his overall defense of this proceeding.  Debtor cannot have it both ways.  He cannot seek to apply issue preclusion to Wang's nondischargeability claim while ignoring its

distracts counsel from the narrow issue left for this Court's determination, namely whether Debtor possessed the requisite state of mind to except the judgment debt at issue from discharge pursuant to § 523(a)(4). For the reasons that follow, the Court concludes that Wang has met his burden of establishing by a preponderance of the evidence that Debtor's behavior satisfies the standard of misconduct required by the Supreme Court in *Bullock* for nondischargeability under § 523(a)(4).

The Court's ruling is predicated both on the evidence presented and Debtor's lack of credibility, the latter of which necessarily begins the Court's analysis. Bankruptcy courts routinely acknowledge that a debtor's lack of credibility in his testimony before the court is ultimately crucial, because honesty is necessary in a debtor's dealings with the court if he desires to obtain the benefit of discharge, which is reserved for honest debtors. *In re Somerville*, 73 B.R. 826, 838 (Bankr. E.D. Pa. 1987). In light of the standard set by the Supreme Court in *Bullock*, Debtor's credibility is highly relevant to Wang's § 523(a)(4) nondischargeability claim. "In weighing the credibility of witnesses, the Court must examine the evidence presented and evaluate the testimony, including variations in demeanor as well as changes in the tone of voice." *Hamdorf v. Gritton (In re Gritton)*, 2003 Bankr. LEXIS 210, at *11–12 (Bankr. N.D. Iowa Mar. 13, 2003) (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985)). The Court can assess credibility based upon the content of the testimony as well as the Court's own vast experience assessing the way people act. *Id.* at *12 (citing *In re Carrigan*, 109 B.R. 167, 170 (Bankr. W.D.N.C. 1989)). "Where two permissible views of the evidence exist, it is the responsibility of the Court to weigh the evidence presented including the credibility of witnesses and make a

application to his own defenses. *See, e.g., Lake George Park Comm'n v. Salvador*, 664 N.Y.S.2d 847, 851 (N.Y. App. Div. 3'd Dep't 1997) (Under New York law, issue preclusion bars review of defenses that were raised and previously rejected in another forum.)

choice between them." *Id.* (citing *In re Waugh*, 95 F.3d 706, 712 (8th Cir. 1996); *In re Dullea Land Co.*, 269 B.R. 33, 36 (B.A.P. 8th Cir. 2001)).

At first blush, Debtor appeared to face a significant language barrier, thus requiring the use of a court sanctioned interpreter.  As the trial progressed, however, it became apparent to the Court that Debtor's comprehension of both the evidence and questions presented to him was better than he first alluded to.  Ultimately, Debtor's use of the interpreter appeared to be sporadic and tactically motivated.  As to Debtor's general demeanor, his mood seemingly shifted from being defiant at times to claiming that he was the person victimized by his business relationship with Wang.  With respect to questions regarding his general corporate knowledge, including questions related to corporate formation, Debtor offered evasive answers and repeatedly testified that his accountant was responsible for setting up his numerous business ventures.  When he did directly answer such questions, he feigned ignorance regarding corporate forms notwithstanding that he had owned and operated several business ventures as sole shareholder and president.  For example, when asked whether he owned Capital Corner, he first stated that his ex-wife owned the restaurant, yet the evidence revealed that he was the sole shareholder and president of Capital Corner and, importantly, he personally sold the business.  This is but one example of Debtor's lack of truthfulness during the course of trial.  The Court's credibility assessment is further supported by the record as a whole, which is replete with examples of contradictory testimony given by Debtor in various court proceedings.  Although Debtor has been involved in multiple judicial proceedings, he appears all too conveniently and frequently to forget important facts and events and, perhaps most troubling, prior testimony given under oath.

As a result of Debtor's lack of credibility and his general demeanor as a witness, the Court is unable to accept his statements and testimony that he was falsely accused of taking

money and that he at all times acted appropriately in his business dealings with Wang and Peace

Food.  Undoubtedly, with years of experience comes knowledge and business acumen.  Hence, it

is safe to assume that Debtor understood the need to keep records of both receipts and expenses,

yet he inexplicably failed to do so with respect to the monies of Peace Food.  The Court is also

certain, despite Debtor's protestations to the contrary, that Debtor signed and understood the

contents of the January and February Resolutions.  The evidence easily establishes that Debtor

consciously disregarded or was willfully blind to a substantial and unjustifiable risk that his

conduct would violate a fiduciary duty.  In the Court's view, Debtor's failure to safeguard and

secure cash receipts, his failure to record and deposit all cash receipts, and his misappropriation

of money is a "gross deviation from the standard of conduct that a law-abiding person would

observe" in his situation.

Further, the evidence suggests that Debtor's conduct was intentional.  Debtor's testimony

that he felt entitled to keep a different amount of cash as income every day speaks volumes.  As

Justice Mulvey found, Debtor was at all relevant times solely responsible for the handling of

Peace Food's revenues and disbursements.  Despite his testimony to the contrary, Debtor is an

experienced businessman who alone was responsible for Peace Food's cash management and

whose conduct demonstrates little regard for corporate formalities or fiduciary responsibility, as

well as an intent to take for himself what monies he believed he was entitled to, without

consultation or input from the other shareholders.  In essence, the record tends to prove that

Debtor freely took funds from the corporate piggy bank for personal use with the intention of

never getting caught since he was the sole person who oversaw the corporate finances.

Moreover, when he was caught by Wang, Debtor attempted to oust Wang from Peace Food

altogether.  Based on the entire record, the Court is convinced that Debtor's actions were

personally motived and aimed at personal gain.   Debtor knew that Wang and the other non-related shareholders had little or no business experience and he took advantage of the same. Now, even when met with the state court findings and determinations, Debtor flatly denies any responsibility for his actions.

## CONCLUSION

It appears beyond doubt that Wang has proven Debtor's culpability as is required by *Bullock*.  In light of the foregoing, the judgment debt owed to Wang is nondischargeable under § 523(a)(4) and judgment is granted in favor of Wang.

It is SO ORDERED.

Dated: August 14, 2013
        Utica, New York

/s/ Diane Davis _____
DIANE DAVIS
United States Bankruptcy Judge